IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| In the Matter of the Search of Lee Correctional Institution, Cell Block F2A-1142-B, associated with CHARLIE DON ROBINSON, located at 990 Wisacky Highway, Bishopville, SC 29010 | Case No. 3:24-cr-00086 |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Kelsie Rubino, a Special Agent with the Federal Bureau of Investigation, being first duly sworn, hereby depose and state as follows:

**I.    INTRODUCTION AND AGENT BACKGROUND**

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the **Target Premises** known as Lee Correctional Institution, Cell Block F2A-1142-B, located at 990 Wisacky Highway, Bishopville, South Carolina (SC) 29010, as described in Attachment A, for the items as described in Attachment B.

2.    I have been employed as a Special Agent (SA) of the Federal Bureau of Investigation (FBI) for approximately four years. I am currently assigned to the Violent Crime and Gang Squad and investigate Violent Crimes Against Children and Human Trafficking. I have received training in the investigation of cases involving production of Child Sexual Abuse Material (CSAM) and sexual exploitation. I've participated in a variety of criminal investigations, including human trafficking, child sexual exploitation, weapon offenses, and white-collar crimes.

3.    I have experience investigating cases involving the use of computers, electronic devices, and the Internet to commit violations of federal law and the use of these items to store information associated with these violations. I have served as the affiant on previous search

warrants and have participated in the execution of search warrants involving the search and seizure of electronic equipment. As such, I am an "investigative or law enforcement officer" within the meaning of Title 18, United States Code, Section 2510(7), and empowered by federal law to investigate and make arrests for offenses enumerated in Section 2518 of Title 18 of the United States Code.

4.  Since this affidavit is being submitted for the limited purpose of obtaining a search warrant, I have not included every fact known to me concerning this investigation. Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that evidence, fruits, and instrumentalities of the violation of Title 18, United States Code, Section 875, Interstate Communications Violation, are located within the **Target Premises.**

II.   **Probable Cause**

5.  On September 26, 2023, a friend, hereinafter, "J.D.", of deceased victim, hereinafter, "A.Y." (20 years old), contacted the FBI. J.D. stated that at the beginning of September, A.Y. began communicating with a female named "Tory" via the dating application PLENTY OF FISH, hereinafter "POF", followed by communication via text messages. "Tory" had the account handle "Tory03" on the application and, once they transitioned to text message, used the TextNow number 920-350-9112. A.Y. began exchanging photographs and messages with "Tory" via text message, which eventually transitioned into messages of a sexual nature. J.D. stated that later that month, A.Y. was contacted by an individual identifying himself as "Tory's" father from telephone number 920-691-5560. This individual told A.Y. that "Tory" was underage and that unless he paid $9,600, he would report A.Y. to law enforcement. J.D. stated that A.Y. took his own life that evening, which was later determined to be the following day.

6. On September 28, 2023, FBI Special Agent Heather Wright met with the parents of A.Y. and obtained A.Y.'s cellular phone along with their consent to search the phone. A.Y.'s father, hereinafter, R.Y., stated that A.Y. had broken up with his girlfriend in August of 2023 and had joined the dating website POF in September 2023. R.Y. provided A.Y.'s email address as "Adamy12987@gmail.com" and stated that A.Y. regularly received notifications from POF through his email which led him to believe that A.Y.'s account was tied to that email address. R.Y. stated that he knew A.Y. had been receiving these notifications because following A.Y.'s death, R.Y. went through his computer, email, and his phone. R.Y. also confirmed that in early July, A.Y. had met an actor on another online dating application that had attempted to extort money from A.Y. R.Y. stated that A.Y. and his mother had gone to the Muskego Police Department in Wisconsin to report the threats. R.Y. stated that nothing ever came of the threats nor the investigation, so R.Y. was not sure if the two incidents were related in any way.

7. In the review of A.Y.'s cellular phone, FBI agents were able to see that on September 9, 2023, A.Y. began communicating with "Tory", first on POF, and later, via text message at 920-350-9112. The communication between "Tory" and A.Y. continued until September 12, 2023. "Tory" told A.Y. that she resided in Green Bay, Wisconsin, and that she was 17 years old and would be turning 18 the following month. The messages were occasionally sexual in nature and several explicit photos were observed to have been sent by both A.Y. and "Tory". Within hours of the conversation starting on September 9, 2023, "Tory" was soliciting A.Y. for a prepaid phone card for her phone, stating she was running out of minutes and if A.Y. wanted to continue to talk with her, she would need assistance paying for minutes. "Tory" told A.Y. which Boost Mobile card to obtain and A.Y. purchased the card and sent an image of it to "Tory" the following day.

8. On September 12, 2023, at 7:28 p.m. (CST), A.Y. received a message from the TextNow telephone number 920-691-5560, claiming to be the father of "Tory." "Tory's Father" messaged that "his daughter" was underage and that "Tory" had been arrested when she attacked her teacher who was trying to take her phone away from her, due to the messages being sent by A.Y. "Tory's Father" stated that he had to pay $9,600 to bail "Tory" out of jail. "Tory's Father" stated that his wife wanted to have A.Y. arrested and registered as a sex offender. A.Y. apologized profusely and repeatedly stated that he was unaware that "Tory" was underage. A.Y. repeatedly stated that he would cease all communication and repeatedly asked what he could do to make things right. "Tory's Father" initially stated that A.Y. should meet the subject and his wife at the Green Bay "station." A.Y. stated that he did not live in Green Bay; however, when A.Y. offered to walk into his local police department and explain to them what had occurred, "Tory's Father" stated that there was no need for A.Y. to do that, but A.Y. should be responsible for half of the bail money he and his wife had to post to bail "Tory" out of jail. A.Y. told "Tory's Father" that he got paid the following day and would send $600. "Tory's Father" stated that he had a CashApp account and that A.Y. should send the money through CashApp the following day. "Tory's Father" also asked A.Y. how often he got paid and agreed that A.Y. would be sending him a bi-weekly payment of $600.

9. On September 13, 2023, A.Y. committed suicide. R.Y. stated that he and his wife were absolutely devastated and had no idea what had been going on prior to A.Y. taking his own life. R.Y. stated that it was clear to him that the subject threatening A.Y. was a scammer that was extorting A.Y. for money.

10. On October 13, 2023, Agent Wright received records from POF after requesting information pertaining to the account "Tory03." The subscriber information for the account

indicated that the "Tory03" account was associated to the email address: "torysm920@gmail.com", a registration IP of 172.58.255.111, a creation date of September 9, 2023, and the telephone number 803-394- 0277.

11. On October 18, 2023, Agent Wright received records from T-Mobile relating to the Boost Mobile pre-paid phone card purchased by A.Y. and provided to "Tory." Within those records, it was observed the card was activated on a phone utilizing the telephone number 803-888-9188, and IMEI number 354563112021422, known as the **Target Cellular Phone.**

12. On October 24, 2023, Agent Wright received records from Google, Inc., based upon a request for subscriber information for the email address "torysm920@gmail.com" and/or any account(s) associated with the cellular telephone numbers 803-394-0277 or 803-888-9188, or IMEI 354563112021422 (including variations 35456311202142 and 354563112021420), for the timeframe of July 1, 2023, through October 18, 2023. Google returned results identifying the following email addresses as associated to the requested account information:

   a) megansmith6023@gmail.com
   b) rsmith678@gmail.com
   c) melissadsm83@gmail.com
   d) whitsm775@gmail.com
   e) jessicasm89@gmail.com
   f) jonathanf565@gmail.com
   g) dianaguevare5@gmail.com
   h) aquanajean@gmail.com
   i) aaronssm83@gmail.com

13. A review of the data returned showed a pattern of connectivity inconsistent with regular telephone usage and a pattern of similar registration names using the last name "Smith" with different first names and a pattern of similar email addresses of first and last names.

14. On November 15, 2023, Agent Wright swore to an affidavit requesting authorization for a search warrant to Google, Inc., for all account information including location, associated to the following:

a) IMEI 354563112021422 (including variations 35456311202142 and 354563112021420)

b) cellular telephone numbers 803-394-0277 or 803-888-9188

c) email addresses "a-i" as referenced above.

15. On November 15, 2023, the warrant was granted by the Honorable United States Magistrate Judge William E. Duffin in the Eastern District of Wisconsin. On November 16, 2023, the warrant was served upon Google, and on December 6, 2023, the results of that search warrant were downloaded via the Google law enforcement portal. Analysis of this data provided a subject, Charlie Don Robinson, hereinafter "Robinson", date of birth 10/25/1992. Robinson was identified via self-taken photographs as well as other identifying photos such as photos of credit cards located within the return associated to the email account "snakerobinson@gmail.com." A facial recognition search was done on the photos recovered and a positive hit of Robinson came back as the individual in the photographs. There were numerous other photographs of females, including explicit photos, such as the ones exchanged with A.Y. On September 9, 2023, at 1:51p.m. CST, the Google account associated with "snakerobinson@gmail.com", searched "Make a one-time payment | Pay Phone Bill Online |Metro by T-Mobile" and "Metro by T-Mobile pay as guest". A search was performed on September 9, 2023, at 3:27 p.m. CST, for "920 area code" and a search on September 9, 2023, at 3:25 p.m. CST for "Cities in Wisconsin".

16.  An open-source search of Robinson located information that Robinson had previously been convicted of felony murder in March of 2019 and was serving his sentence at Lee Correctional Institution located in Bishopville, South Carolina.

17.  On December 13, 2023, Agent Wright swore to an affidavit requesting authorization for location information regarding the **Target Cellular Phone**, and on December 13, 2023, the warrant was authorized by the Honorable United States Magistrate Judge William E. Duffin. The search warrant was served upon T-Mobile on December 14, 2023, and location information began to be transmitted that same day. A review on the location information confirmed that the **Target Cellular Phone** is currently located in the area of Lee Correctional Institution.

### III.    Technical Terms and Forensic Analysis

18.  Based on my training and experience, the following technical terms convey the following meanings:

   A.  *Wireless telephone*: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments,

and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

B. *Digital camera:* A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

C. *Portable media player:* A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

D. *GPS:* A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another

location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

19. Based on my training and experience, I know that modern cellular phones often have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, and GPS navigation device. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

20. Based on my training and experience, I know that electronic devices like cellular phones can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

21. As described above and in Attachment B, this application seeks permission to search for records that might be found in the **Target Premises**, in whatever form they are found. One form in which the records might be found is data stored on cellular phones. Thus, the warrant

applied for would authorize the seizure of cellular phones or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

22.   *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic electronic evidence that establishes how electronic devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any electronic device located at the **Target Premises** because:

   E. Data on a device can provide evidence of a file that was once on the device but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   F. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   G. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   H. The process of identifying the exact electronically stored information on a device that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge

about how the device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

I. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

J. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of electronic devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

IV. **Conclusion**

23. I respectfully submit that there is probable cause to believe that the **Target Premises** contains evidence of violation of Title 18, United States Code, Section 875, Interstate Communications Violation. Accordingly, if the requested warrants were approved, I respectfully submit relevant and probative evidence would be recovered.

Assistant United States Attorney William Witherspoon has reviewed this affidavit. I swear, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge.

(The remaining portion of this page intentionally left blank.)

Respectfully Submitted,

Kelsie Rubino
Special Agent
Federal Bureau of Investigation (FBI)

SWORN TO ME VIA TELEPHONE OR
OTHER RELIABLE ELECTRONIC MEANS
AND SIGNED BY ME PURSUANT TO
FED. R. CRIM. P. 4.1 AND 4(d) OR 41(d)(3),
AS APPLICABLE

This __12th__ day of January, 2024
Columbia, South Carolina



Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE